No. 23,064

THE KANSAS ELECTRIC UTILITIES COMPANY, *Appellee,* v. J. D.
BOWERSOCK and R. C. JACKMAN, Copartners doing busi-
ness as THE BOWERSOCK MILLS & POWER COMPANY, *Ap-
pellants.*

SYLLABUS BY THE COURT.

1. CONTRACT—*Defendants to Furnish Electric Power to Plaintiff—Con-
tract Unambiguous—Contract Construed.* Under a written contract
in force since 1909, and which was to extend for twenty-one years
unless terminated as provided in the contract, defendants have fur-
nished electric power to plaintiff to be used in the operation of its
railway and electric-light plants. A controversy arose between them
over a paragraph in the contract which provided in substance:

If after the installations as herein provided for are made by the
defendants it should be ascertained after careful trial and demon-
stration that the water power is unsatisfactory or insufficient to
operate the mills of defendants and the plants of plaintiff, then this
contract shall be abrogated and declared null and void, and in such
event a former contract between the same parties, a copy of which is
attached hereto, shall be in full force and effect.

In the same clause it was provided that in the event it should be
found that the water power was unsatisfactory for the successful
operation of the plants of both parties the plaintiff should have the
right to purchase the auxiliary steam or gas plant at its then value.

Acting under this clause, the defendants served notice in 1919 of
their intention to abrogate the contract, when this suit was brought to
enjoin such action. The rules that a contract must be construed in its
entirety; that where it is not ambiguous its terms control, and ex-
traneous evidence cannot be resorted to to explain the contract; that
where the contract is clear and unambiguous, courts will not resort to
the rule of practical interpretation by the conduct of the parties, are
applied, and *held,* (*a*) There is nothing ambiguous in the contract;
(*b*) The provision for ascertaining after careful trial and demonstra-
tion whether the water power was unsatisfactory or insufficient did
not refer to a single specific test, or mean that in case such test
demonstrated that the power was satisfactory, then from that time
until the end of the twenty-one-year period defendants were bound to
furnish all the energy required by plaintiff; (*c*) the provision referred
to a continuous possibility of the water power proving unsatisfactory
or insufficient from any cause at any time, and the provision per-
mitting either party to abrogate the contract continued in force for
the purpose of meeting such conditions.

2. SAME—*Delay Alone Never Constitutes Laches—Defendants Lost No
Rights Under the Contract by Delay.* Delay alone never constitutes
laches. It is therefore held that defendants lost none of their rights

under the abrogation clause by delay in seeking to take advantage thereof, nor by their continuing performance, even after having notified plaintiff of an intention to abrogate the contract.

3. SAME—*Rules for Construction of Clauses in Contracts—Repugnancy.* In this case it is held that there is no room for the application of the rule that a subsequent clause of a contract must be disregarded because of repugnancy to prior provisions, for the reason that it is found that there is no repugnancy between the prior and subsequent provisions of the contract.

Appeal from Douglas district court; CHARLES A. SMART, judge. Opinion filed November 12, 1921. Reversed.

*S. D. Bishop,* of Lawrence, *Justin D. Bowersock,* and *Robert B. Frizzell,* both of Kansas City, Mo., for the appellants.

*Gilbert H. Frith,* of Emporia, *Hugh Means, Charles H. Hobart,* and *Raymond F. Rice,* all of Lawrence, for the appellee.

The opinion of the court was delivered by

PORTER, J.: Since 1909 the defendants, under a written contract with the Lawrence Railway and Light Company (since acquired by the plaintiff), have been furnishing electrical power to the plaintiff, and the sole question in this case is one involving defendants' right to terminate the contract. The plaintiff, and its predecessor in interest, will be referred to as the plaintiff. Sometime in 1915 defendants notified plaintiff that they had reached their capacity in furnishing electric energy. On various occasions thereafter the parties discussed the matter until 1918, when the defendants gave plaintiff formal notice that they would be compelled to terminate the contract because of the insufficiency of water power. Notice of termination was again given in 1919, when plaintiff brought this action to enjoin defendants from terminating the contract.

On the trial the court made findings of fact and conclusions of law, finding the issues in favor of the plaintiff, and granted the injunction. The defendants appeal.

The defendants are the owners of the Bowersock mills at Lawrence and the Bowersock power dam in the Kaw river at Lawrence. At the time the contract was made, April 24, 1909, both parties believed the water power sufficient to cover the demands of both under ordinary conditions and to allow for normal growth of the business of both. Doubtless for that

reason there was no express limit placed in the contract as to
the amount of energy which was to be used by the plaintiff or
furnished by the defendants.   It was stated in the contract
that defendants proposed to furnish, and plaintiff proposed to
take, the energy required by the plaintiff.· There was, how-.
ever, a conditional limit mentioned in the contract which was,
the extent of the water power supplemented, in case of extra-
ordinary occasions, accidents and emergencies, with steam
power.   In 1909 the amount of power demanded by plaintiff
was 643,000 kilowatts per year.  By 1914 plaintiff's demand
had increased to 1,686,000 kilowatts; in 10 years it had in-
creased to 2,164,000.  The increase was occasioned largely by
the demand for electric light which usually comes during the
hours from 6:00 ʼto 12:00 p. m.   This demand is spoken of in
the evidence as the "peak load," and from 1909 to 1919 the
peak load had increased more than three times.   During these
years the demand of the defendants likewise increased.  They
constructed a second flour mill, doubling their demand for that
purpose, and took on a contract with the city of Lawrence for
pumping water, which required additional power.   The second
mill, however, was shut down during the peak load, and the
contract with the city contained a provision that it should re-
ceive only such amount of power as might be absolutely neces-
sary between 6 o'clock p. m. and midnight.   In 1915 defend-
ants put flushboards two feet high on top of the dam, increas-
ing the head of water by an equal amount.   The boards were
washed away several times a year but were replaced and main-
tained, and they added about one-third to the capacity of the
water-power plant.   In 1916, plaintiff required 260,000 kilo-
watts more than in 1915, and it was found necessary to operate
the auxiliary steam plant on more than five-sixths of the days
of that year.   After the defendants, in the fall of 1918, notified
plaintiff that they would be obliged to terminate the contract
in accordance with its terms and urged plaintiff to make other
arrangements to obtain power, defendants renewed their stor-
age batteries and made a number of changes in an attempt to
increase the water power.   Use of the auxiliary steam plant
was required on more than four-fifths of the days during 1918,
and in 1919 on more than two-thirds of the days.

There is no claim by either party of deceit or fraud in the

wording of the contract, and no claim that either party misunderstood its terms. There is no question concerning its validity, and both parties insist upon its enforcement.

The first paragraph of the contract provides that defendants shall sell and deliver to plaintiff electric energy, and that plaintiff shall purchase and pay for the same for a term of twenty-one years unless sooner terminated as provided in the contract.

The next paragraph provides that when there is not ample or sufficient water power to operate the railway and electric lighting system of plaintiff, the defendants shall supply sufficient power from the auxiliary steam plant, and provides for certain installations of water power, steam and electrical equipment. The plaintiff also agreed to install certain electrical storage batteries, "to be charged and paid for to the extent of $45,000 in cash," and also to install an auxiliary steam turbine or gas engine plant.

The third paragraph provides:

"The party of the first part proposes to furnish all the power that may be necessary and required by the party of the second part. It is not the understanding nor agreement that The Bowersock Mills and Power Company will operate the steam or gas plant continuously, or the water power plant and steam plants together continuously. It is the understanding that the water power under ordinary conditions will supply the power to be required, and the steam or gas plant is for extraordinary occasions, accidents or emergencies. In case the party of the first part has not sufficient water power at any time to supply sufficient current for the party of the second part, it shall immediately and so that there will be no unreasonable interruption in the operation of its railway or lighting system, put in operation the auxiliary steam or gas engine plants as the case may be, in order to supply sufficient power for the party of the second part, and to exercise due diligence in operating its plants to provide the party of the second part with a continuous supply of energy or power to meet the requirements of the party of the second part."

The same clause provides in substance that if all the power generated from the auxiliary plants shall be temporarily necessary for the interest of the plaintiff, it shall have the exclusive use of the same.

In the fifth paragraph it is agreed that the defendants do not guarantee to maintain the dam and power, and will only be entitled to pay when they furnish a merchantable electric current and that—

46—109 Kan.

"In case of the failure, however, of the party of the first part to maintain its dam and water power, or in case this contract for any reason is abrogated or annulled, then the party of the second part shall have the right to acquire the auxiliary steam turbine or gas engine plant to be erected by the party of the first part in the manner as hereinafter provided."

The main controversy between the parties arises over the terms of paragraph six, which reads as follows:

"If, after the installations are made as herein provided for by the party of the first part, it should be ascertained after careful trial and demonstration, that the water power is unsatisfactory and insufficient to operate the mills of the party of the first part and the plants of the party of the second part, then this contract shall be abrogated and declared null and void, and in such event, the contract made on January 2, 1906, by and between the Bowersock Mills and Power Company and The Lawrence Electric Light Company, a copy of which is hereto attached, shall be in full force and effect, otherwise said contract made between The Bowersock Mills and Power Company and The Lawrence Electric Light Company, on account of the considerations herein mentioned shall be fully annulled and of no force and effect.

"In the event that the operation of such plants can be successfully carried on by any alterations, modifications or installations of any additional devices, machinery or appliances at a total cost of not exceeding five thousand dollars, then the same shall be remedied without unnecessary delay by the party of the first part.

"In the event that it should be found that water power is unsatisfactory for the successful operation of the purposes of either or both the parties hereto, the party of the second part shall have the right to purchase the auxiliary steam or gas plant at its then value and in case the parties can not agree upon such value, the same shall be submitted to arbitration in the following manner. . . ."

There follow provisions for the appointment of arbitrators for fixing the value of the plant in the event plaintiff should exercise its right to purchase the auxiliary steam or gas plant at its then value, and in case the parties should be unable to agree upon the valuation.

It is plaintiff's contention that the provision referred to a single specific test of the character and sufficiency of the water power, and that in case such test demonstrated that the power was of a satisfactory character and was sufficient, that ended the matter, and that from that time until the termination of the twenty-one-year period, defendants were bound to furnish all the energy required by the plaintiff. On the other hand the defendants make the contention that these provisions refer

to a continuous possibility—the possible unsatisfactoriness or insufficiency of the water power from any cause at any time, and that these provisions continued in force during the life of the contract for the purpose of meeting such conditions. They further contend that the water power has now become entirely insufficient, and that the contract by its express terms is subject to termination. The trial court took the view that the contract was ambiguous in this respect and heard considerable evidence for the purpose of determining its meaning.

We are unable to discover anything ambiguous in this paragraph—standing alone, and when other paragraphs, notably paragraph three, are read in connection with it, and the contract is considered in its entirety, there can be no doubt as to the understanding of the parties. The defendants, in connection with operating flour mills, maintained power plants and had surplus energy to sell. Plaintiff required for its purpose electric energy and both parties understood and anticipated that the normal growth of the business of each would increase the demands for electric power. The plaintiff did not contract for an unlimited supply of energy; nor did it understand that defendants in entering into the contract contemplated sacrificing their own demands or checking the normal growth of their plants in order to supply an increased demand of plaintiff. Neither party knew in 1909 the capacity of the water power. Both believed that on ordinary occasions it would prove sufficient to meet the demands of both and probably allow for the normal expansion of the business of both. Hence the provision limiting the extent to which defendants obligated themselves to make use of steam power, which was to supplement the water power with steam power in case of extraordinary occasions, accidents and emergencies. It is hardly conceivable that either party anticipated the remarkable increase in the demands of plaintiff for electric energy—an increase from 643,000 kilowatts per year to 2,164,000 kilowatts, in ten years; or that either anticipated that the capacity of the plaintiff's mills and the defendants' own demand for power would be more than double.

Paragraph six specifically mentions a former contract between the parties, made on January 2, 1906, and declares that if after all installations are made it should be ascertained, after

careful trial and demonstration, that the water power is unsatisfactory and insufficient to operate the defendants' mills and the plaintiff's plants, the contract shall be abrogated and the contract of 1906, a copy of which is attached, shall thereupon come into full force and effect, with an additional proviso that if the operation of the plants of both parties can be successfully carried on by any alterations or installation of additional appliances to cost not to exceed $5,000, then the same shall be furnished by the defendants without unnecessary delay, and a further provision is that in the event it should be found that the water power is unsatisfactory for the successful operation of the purposes of either or both of the parties, plaintiff shall have the right to purchase the auxiliary steam plant at its then value.

The plaintiff alleged in the reply that "the new installations provided for in said contract of April 24, 1909, were all made and completed prior to the 1st day of March, 1910, and that thereafter a careful trial and demonstration was made, and as a result thereof the power developed by *defendants' plants* proved satisfactory and sufficient to furnish the electric energy required for plaintiff's use and to operate the mills of said defendants, as they then existed." But the purpose of the demonstration provided for in the sixth clause of the contract was to ascertain whether the *water power* alone was satisfactory and sufficient to operate the plants of both parties, except in cases of emergency—not whether the power developed from defendants' steam and water-power plants was sufficient.

The contention of plaintiff that the provision for trial and demonstration was understood to refer to the making of a single specific test to ascertain whether the water power was of a satisfactory character and sufficient, and that both parties understood that if such a test—made, though it might be as early as 1910—proved favorable, it would result in the final exhaustion of the force of the provision for the abrogation of the contract is, in our opinion, not a reasonable construction of the language of the paragraph. The language is not that "after a careful trial" or after "a demonstration." The use of general terms indicates that it was not intended to limit the test to a single trial or to a specific demonstration. Moreover, this is manifest from other specific provisions of the contract

and is in harmony with the evident intention of the parties when the contract is considered in its entirety.

The provision for abrogating the contract was not for the benefit of the defendants alone; it was for the mutual benefit of both parties and gave to either the right under certain conditions to declare the contract annulled and the old contract in force. One of the most certain things about the contract is that the parties contemplated the possibility of the power becoming wholly unsatisfactory and insufficient from any cause, at any time, because of changing conditions in the water supply and enlarged demands for power to take care of the normal growth of the business of both parties. It is inconceivable that the contract contemplated that, notwithstanding these possibilities, defendants were binding themselves to furnish plaintiff whatever amount of power plaintiff might require for the balance of the twenty-one years, and at the sacrifice of their own business, provided the result of a test made within twelve months after the execution of the contract should demonstrate that the water power was satisfactory and sufficient for the requirements of both parties as conditions then existed. And yet, plaintiff's position in this lawsuit is, in effect, that because in 1909 or 1910 it was demonstrated that defendants were able to furnish plaintiff 643,000 kilowatts, which was sufficient for its demands at that time, they must in 1919 furnish plaintiff 2,164,000 kilowatts.

In fact there is no specific limitation of the time in which the ascertainment is to be made except that it is after careful trial and demonstration, which, of course, must be construed as referring to the means and not the time of ascertainment. The trial and demonstration are merely incidental to the direct requirement that ascertainment be made. The plaintiff's contention would in effect eliminate the word "sufficient," because the water power was something subject to constant change and its sufficiency for the next twenty years could not in the nature of things be ascertained in 1910. As we construe the contract the question was not to be determined once for all by the conditions existing at the time the installations were made, but was subject to be determined from time to time as conditions might be changed by the flow of water in the river, or by an increase or decrease of the energy required to operate these

plants. In other words, paragraph six contemplates a continuous possibility that while the water power might prove sufficient at first, it might by changed conditions at any time during the life of the contract become wholly insufficient, in which event the contract would then, at the instance of either party, become subject to termination. For instance, the first paragraph provides that the contract shall be in force for the term of twenty-one years "unless sooner terminated as provided herein." The language "unless sooner terminated as provided herein" has reference to a continuing right or possibility of termination. The fifth paragraph declares that the defendants do not guarantee to maintain the dam and water power, and will only be entitled to pay when they furnish a merchantable electric current, with a further provision protecting the plaintiff by giving it the right to acquire the auxiliary plant in the event of defendant's failure to maintain, or in case the contract for any reason is abrogated or annulled. This provision undoubtedly continues in force during the entire twenty-one years and gives plaintiff the right to purchase the auxiliary plant at any time the water power fails. The provision that if the water power proved insufficient to supply power to both parties, the former contract between the parties shall immediately spring into force, and that the plaintiff may acquire the steam plant and may take immediate possession pending negotiations, protects the plaintiff and avoids the slightest possibility of its being deprived of power by unnecessary delays.

We are aided in our construction, too, by the provision in paragraph six, undoubtedly a continuing one, to the effect that if the expenditure of $5,000 would remedy defects discovered by trial or demonstration, then the defendant should make that expenditure and remedy the defect. And in paragraph five it is declared that the defendants do "not guarantee to maintain said dam and power and will only be entitled to pay when" they furnish a merchantable electric current; and the same clause further provides that in case the contract for any reason is abrogated, plaintiff is given the right to acquire the auxiliary steam plant. It is clear that if the water power failed to furnish sufficient energy for plaintiff's use, there was no provision that defendants should operate the steam plant. Under paragraph five, the plaintiff's only remedy in that event

was to purchase the steam plant. We have already referred to paragraph three, which declares that it is not the understanding that the steam plant shall be operated continuously or the water and steam plants together continuously, and that it is the understanding of the parties that the water power is sufficient under ordinary conditions, and that the steam plant is to be used for extraordinary occasions, accidents and emergencies.

The provision in paragraph six, tested by itself and by reference to other provisions, and by the contract considered as an entirety, discloses no ambiguity. The provision for trial and demonstration is construed to be a continuous one which contemplated a possibility that the water power might prove unsatisfactory or insufficient at any time. It is hardly necessary to refer to authorities that the contract must be construed as a whole (*Howerton v. Gas Co.*, 81 Kan. 553, 106 Pac. 46), or that where it is not ambiguous the terms of the contract control, and extraneous evidence cannot be resorted to to explain the contract. (*Walsh v. Fuel Co.*, 102 Kan. 29, 169 Pac. 219.)

In its reply plaintiff alleged that defendants were estopped and also guilty of laches because they voluntarily used steam to supply the deficiency in the amount of energy, and as one of its conclusions of law the trial court held that "the voluntary and continuous use of steam to supplement the water power to carry the peak load since the inception of the contract constitutes a practical interpretation given to the contract by the parties, which interpretation the courts will adopt."

In voluntarily using steam when absolutely not required to do so by the contract the defendants lost none of their rights under the contract which, by express terms, was to continue for twenty-one years "unless sooner terminated as provided herein." The right to terminate was a continuing one, to be exercised at the election of either party. Continued performance, even after giving formal notice of an intention to abrogate, manifested a desire on defendants' part, not only to benefit themselves but the plaintiff as long as practicable. To deny defendants at any time during the twenty-one-year period the right to rely upon the abrogation clause upon any such grounds would be most inequitable. The delay in

moving to rescind benefited, rather than prejudiced, plaintiff. Delay alone never constitutes laches. It has been said that—

"Laches in legal significance, is not mere delay, but delay that works a disadvantage to another." (10 R. C. L. 396.)

"One who goes beyond the requirement of his contract in circumstances of doubt ought not from that fact alone to have his act given the effect of a concession." (McLean & McLean v. Windham Lt. & Power Co., 85 Vt. 167, 176.)

Moreover, there was no room in this case for the application of the rule of practical interpretation, which is resorted to by the courts only when there is ambiguity or doubt as to the meaning of the contract.

"Where the contract is clear, there is no necessity for resorting to the conduct and dealings of the parties for a construction. In such a case the contract speaks for itself." (Glynn v. Moran, 174 Mass. 233, 237. See, also, Plano Manf'g Co. v. Ellis, 68 Mich. 101.)

Another of the court's conclusions of law was that if it should be determined that the provisions of article six of the contract contemplated a trial and demonstration at any time during the life of the contract and that the contract can be abrogated at any time for insufficiency of water power from whatever cause, "then and in that event such provision must be disregarded because it is repugnant to prior provisions of the contract," citing 6 R. C. L. 847.

The paragraph cited by the court states a rule as follows:

"It has been laid down as elementary law that if two clauses of a contract are so totally repugnant to each other that they cannot stand together, the first shall be received and the latter rejected."

The contract in this case contains no repugnant clauses. The theory of the lower court loses sight of the language of clause one which declares an intention to deliver and continuously maintain electric energy "so far as is reasonable and practicable," and "subject to the provisions of this contract for the term of twenty-one years, unless sooner terminated as provided herein." The first clause gave notice to all parties concerned that it was to be modified by subsequent provisions of the contract—not only defining what was meant by the expression "so far as is reasonable and practicable," but that the agreement to sell and deliver for the term of twenty-one years was expressly subject to subsequent provisions providing for the abrogation of the contract.

Utilities Co. v. Bowersock.

In the same paragraph of Ruling Case Law quoted by the trial court it is said:

"Moreover, it is only when the language of a clause, with reference to the actual facts, involves such fatal errors and mistakes as leave the court without reasonable means of ascertaining the real intention that the clause will be rejected." (6 R. C. L. 847.)

A slavish adherence to a like rule long followed by the courts in cases involving the construction of different clauses or separate provisions of a will resulted in a wilderness of useless precedents, and often in the defeat of the testator's intention. Modern courts have shown a constant tendency to break away from these artificial rules and to look to the entire instrument in order to discover if possible the testator's real intention.

In *Markham v. Waterman,* 105 Kan. 93, 95, 181 Pac. 621, it was said:

"The old rule that a seemingly unqualified devise in an independent and prior clause of a will cannot be diminished by separate, subsequent clauses of the will (*McNutt v. McComb,* 61 Kan. 25, 58 Pac. 965; 4 Kent. Comm. 270), has been largely superseded by the modern Kansas rule, that the testator's intention is to be gleaned 'from the four corners of the instrument'—from the entire text of the document. Some of our earlier cases foreshadow the coming of this doctrine (*Williams v. McKinney,* 34 Kan. 514, 519, 9 Pac. 265; *Ernst v. Foster,* 58 Kan. 438, 47 Pac. 527), and this court was fully committed to it in *Bullock v. Wiltberger,* 92 Kan. 900, 142 Pac. 950, and has followed it consistently in all the later cases."

In another very recent case, *Pearson v. Orcutt,* 106 Kan. 610, 189 Pac. 160, the court again refused to follow as a precedent, *McNutt v. McComb,* supra, and said of that decision:

"It was influenced largely by the application of the ancient and artificial rule that where the language of a will on its face imports the vesting of an absolute fee that effect shall not be denied by reason of a subsequent clause attempting a limitation thereon. This rule is one of a number of somewhat similar character made use of in solving problems arising from conflicting provisions by giving preference to one or the other according to some hard and fast formula, instead of attempting to reconcile them—to ascertain and carry out the actual wishes of the testator as derivable from his language and the attending circumstances. The primary rule of construction now followed by this court, in that situation as in all others, is to give effect to the testator's real intention as gathered from the entire document, without regard to the place in which it occurs, except so far as that circumstance may logically throw light on his meaning." (p. 612.)

The same considerations of reason and justice apply to ordinary commercial contracts like the one involved in the present case. The extent to which the modern rule of construction should control in cases involving deeds is, perhaps, another question.

Inasmuch as the contract fully protects plaintiff's rights in case defendants elect to take advantage of the abrogation clause, no reason is apparent why judgment should not be directed.

The judgment is reversed and the cause remanded with directions to discharge the injunction and render judgment in defendants' favor for costs.