No. 26,629.

R. C. JACKMAN, Surviving Partner of the Firm of J. D. BOWERSOCK and R. C. JACKMAN, doing business as THE BOWERSOCK MILLS AND POWER COMPANY, *Appellant*, v. THE KANSAS ELECTRIC POWER COMPANY, *Appellee*.

SYLLABUS BY THE COURT.

1. ELECTRICITY — *Action for Balance Due on Current Furnished — Accord and Satisfaction—Estoppel.* In a contract by which plaintiff agreed to furnish electric energy to defendant at a named price for a long period of time, there was a stipulation that if a certain contingency arose the plaintiff might terminate the contract and that defendant would then have the right to purchase a certain part of the power plant from plaintiff at its then value. A dispute arose as to the right of plaintiff to terminate the contract, whereupon it was agreed by the parties that certain steps should be taken for obtaining a judicial inquiry and decision of the question. The steps were taken and an injunction order was obtained without the giving of bond, but the case was not finally decided until two and one-half years thereafter, when the right to abrogate the contract was sustained. In the meantime electric current had been furnished as before, monthly bills were presented to and paid by defendant at the rate theretofore paid, and on the back of the check used in making payments each month, there was indorsed an acknowledgment that the check was paid in full settlement of the account. The value of the electric current during the period of the litigation was more than the price paid by the defendant on the bills as presented. Plaintiff brought an action to recover the excess value, and it is held that the decision of the trial court, to the effect that under the facts there was an

---

Accord and Satisfaction, 1 C. J. pp. 539 n. 74, 561 n. 80, 562 n. 88. Contracts, 13 C. J. p. 534 n. 40. Electricity, 20 C. J. p. 336 n. 20.

accord and satisfaction, and that plaintiff is now estopped to ask for more than the price paid and which was accepted without objection as payment, should be affirmed.

2. CONTRACTS—*Construction*—*Purchase of Plant at "Then Value."* The contract involved provided that in a certain event the contract might be terminated, whereupon the defendant might purchase an auxiliary plant at its then value. The contract was abrogated on July 1, 1919, but the defendant did not take possession of the plant until January 1, 1922. It is held that the then value as provided in the contract was the value of the plant when the contract was abrogated and when defendant's right to purchase accrued.

Appeal from Shawnee district court, division No. 1; JAMES A. McCLURE, judge. Opinion filed December 11, 1926. Modified and affirmed.

*C. A. Smart,* of Lawrence, *Bennett R. Wheeler, S. M. Brewster, John L. Hunt,* all of Topeka, *Justin D. Bowersock, John F. Rhodes* and *Robert B. Fizzell,* all of Kansas City, Mo., for the appellant.

*Raymond F. Rice,* of Lawrence, and *Gilbert H. Frith,* of Emporia, for the appellee.

The opinion of the court was delivered by

JOHNSTON, C. J.: R. C. Jackman, the surviving partner of the firm of Bowersock Mills and Power Company, brought this action against the Kansas Electric Power Company to recover on two claims, one for a balance of $117,791.74, alleged to be due for electric current furnished to and used by the latter. The partnership, spoken of hereinafter as plaintiff, owned a water power and also mills at Lawrence. The Kansas Electric Power Company, hereinafter designated as defendant, is the successor in interest of the Lawrence Electric Light Company, and the Lawrence Railway and Light Company, and is operating an electric street-railway system as well as the lighting of the city of Lawrence. In 1906 a contract was made between the plaintiff and the Lawrence Electric Light Company, a predecessor of the defendant, in which the plaintiff agreed to purchase certain equipment and furnish electric current generated by water power suitable for commercial lighting at one and one-fourth cents per kilowatt. Later and on April 24, 1909, when the Lawrence Railway and Light Company had arranged a purchase of the property of the Lawrence Electric Light Company, the plaintiff and the Lawrence Railway and Light Company entered into a contract by which it was provided that plaintiff should furnish electrical energy to defendant for twenty-one years suffi-

Jackman v. Kansas Electric Power Co.

cient for the operation of the street cars and the lighting system of the defendant, also to supply an auxiliary steam or gas plant so far as necessary, and to install electric storage batteries of a stated power with certain equipment necessary to supply a specified character of current. While providing for the auxiliary plant and storage batteries, there was a stipulation in the contract that:

"It is not the understanding nor agreement that the Bowersock Mills and Power Company will operate the steam or gas plant continuously, or the water power plant and steam plants together continuously. It is the understanding that the water power under ordinary conditions will supply the power to be required, and the steam or gas plant is for extraordinary occasions, accidents or emergencies."

The plaintiff was operating mills of its own from the same power plant, but it was stipulated that the defendant should have the first right and the first call on the auxiliary plant, and that plaintiff should not use or dispose of power from that plant unless there remained sufficient power to care for the demands of the defendant. Power was furnished to defendant under the contract from 1909 until about July 1, 1919, at the stipulated price of one and one-fourth cents per kilowatt, but shortly before that time plaintiff indicated a purpose to terminate the contract, and thereupon a dispute arose between the parties as to the right of plaintiff to terminate it. A conference between the parties representing plaintiff and defendant was held and both being desirous of having the question settled, it was agreed that plaintiff should serve a notice upon defendant of its intention to abrogate the contract, and the defendant should thereupon procure an injunction so that the matter in dispute might be determined. The notice was served upon defendant, the temporary restraining order was asked for and issued, restraining the plaintiff from cutting off the supply of electric energy until the further order of the court. No bond was given when the order was obtained nor was any bond ever asked for or furnished. Evidently it was anticipated that an early decision of the dispute would be obtained, but for some reason not shown a decision of the district court was not made until January, 1920, when an appeal was taken to the supreme court, and in November, 1921, that court reversed the judgment of the district court sustaining the injunction, and held that the plaintiff had a right to terminate the contract. (*Utilities Co. v. Bowersock,* 109 Kan. 718, 202 Pac. 92.) During this litigation power was furnished by the plaintiff as had been

previously done, and it was paid for at the price fixed in the contract. There was no specific agreement with reference to the price, but defendant insists that it was tacitly understood that the contract price would be the measure of compensation to be paid until the question of the right to abrogate the contract had been settled. The reasonable value of electric energy during the injunction period was found to be a little more than two cents per kilowatt, and would not exceed two and one-fourth cents per kilowatt. There was a finding that the evidence was not sufficient to show an express agreement that the old rate should continue in force during the contemplated litigation, nor any expression by either party of an intention that a different rate should be charged. On this branch of the case the trial court found that each month during what is termed the injunction period the plaintiff rendered bills for the electric current in which the whole number of kilowatts furnished was stated, the price per kilowatt, one and one-fourth cents, and the total amount due. On these bills the defendant issued its voucher check reciting "in full settlement of statement accompanying this check." Upon the check was printed an indorsement as follows: "The indorsement of the payee hereon is an acknowledgment of the receipt of the statement referred to on the face of this check and in full payment thereof." It was further found that all of the checks were indorsed and cashed by the plaintiff without question, objection or comment. Among other things the court found was that during this period the plaintiff at no time asked, demanded, or in any way intimated to defendant that a different price would be charged; that during that time the defendant believed that it was paying in full for the service rendered and made the payments as specified under the belief that payment in full was being made. Judgment was therefore rendered denying a right of recovery upon the first count of plaintiff's petition.

It is contended by plaintiff that the contract having been abrogated in July, 1919, it had the right to demand and receive the reasonable value of the electric energy furnished; that defendant by its act in obtaining an injunction had placed the plaintiff in a position where it could not present bills or demand more than the contract price. It is contended that while the injunction was pending it was not permissible for it to insist on a higher price until the right to abrogate the contract had been determined. It is said that the district court having adjudged that the plaintiff could not terminate

the contract nor change the price, plaintiff could have done nothing more under the circumstances than to have notified defendant that if the judgment was reversed plaintiff would demand a higher rate.

On the other hand, it is insisted that there has been accord and satisfaction, in that the monthly bills were presented, paid in the manner hereinbefore described, and, further, that under the agreement to submit the matter of the abrogation of the contract to the court, and the action of the parties since that time, as well as the proceedings had, the plaintiff was estopped to claim more than was paid and which was accepted without objection by plaintiff. On this branch of the case the finding and conclusion of the trial court in favor of defendant must be sustained. A written opinion was prepared and delivered by that court in which the facts relating to this claim were carefully considered and the grounds of the decision so well stated that the opinion is reproduced here with approval and a judgment of affirmance. After reciting facts already stated, the opinion proceeded:

"In January, 1922, the defendant company elected to buy the plant as provided for by the contract, and took the plant over. Afterwards this suit was brought. The first count is to recover for the reasonable value of the current furnished the defendant during the time the injunction order was in force. The first question presented is as to the character of this first cause of action. Is it a suit in damages, or is it a suit upon an implied contract? If it is a suit in damages, it cannot be maintained, because it would be a suit brought for wrongfully obtaining the injunction, and inasmuch as no bond was given, a recovery could not be had thereon. If it is a suit upon an implied contract, a recovery might be had. The plaintiff is not seeking to recover profits lost, but is seeking rather, to recover the reasonable value of the service which it furnished during the time the injunction was in force. The plaintiff offered evidence as to the cost of production, and the expense which it was required to pay, by reason of furnishing this current, but I think at the time that it was offered, it was made very clear, that it was offered upon the theory of its being a proper element to be considered in arriving at the reasonable value of the service furnished. Under the pleadings I think the court should hold that this was a suit brought upon an implied contract. The law recognizes three kinds of contracts, namely, express contracts, contracts which are implied in fact, and contracts which are implied in law. I think that the substance of the petition clearly shows that this comes within the third class, as being a contract implied by law. That kind of a contract is recognized in the case of *Foundling Hospital v. Harrington,* 113 Kan. 521, which I will not take the time to read, as no doubt all the parties are familiar with it. In other words, I think that the plaintiff's theory of recovery is tenable. The extent of the service furnished is definitely ascertained. During this period, there were some 6,730,780 kilowatts delivered. The contract rate was one and one-fourth cents per kilowatt. The

defendant paid the contract rate during that time. The plaintiff now claims that the contract rate was not the reasonable value of the energy that was furnished, but that it was worth three cents per kilowatt, and that there is now due the plaintiff the difference between the contract rate and the rate actually paid by the defendant, which it claims was the reasonable value of the energy so furnished.

"From the evidence I think the court can fairly conclude that the value of the steam-generated electricity at Lawrence at the time in question was worth slightly in excess of two cents per kilowatt; that it could be procured from Leavenworth or Kansas City for two and a fraction cents; that the price of it varied, but that two and one-fourth cents would probably be the fair and reasonable value of the steam-generated electricity. Some of the electricity furnished by the plaintiffs to the defendant was generated by the water wheels, the manufacturing cost of which is much less than that manufactured by steam.

"The first defense made by the defendant is, that there has been an accord and satisfaction by the plaintiff, and that there is nothing due the plaintiff by reason of the energy furnished. After the temporary injunction order was served upon the plaintiff, it continued to furnish electrical energy to the defendant just like it had for the ten years preceding, from the time the contract was entered into in 1909. The contract was for a period of twenty-one years, and in 1919 when the controversy arose between the parties, still had eleven years to run.

"Each month the plaintiff billed the defendant for the amount of current furnished during the preceding month. I have taken exhibit Q as a sample bill. The current furnished the defendant was divided into two classes, that which was furnished for the railway company's use in the operation of its street-car system, and the other that was furnished to the inhabitants of the city of Lawrence for illuminating purposes, each class being measured by a separate meter, and bills rendered therefor. The bill rendered August 1, 1919, for electric current furnished for illuminating purposes shows 104,540 kilowatts, at 1¼ cents, $1,306.75; while the bill rendered on the same date for electric current furnished for the operation of the street-car system shows a total of 34,990 kilowatts, at 1¼ cents, $437.38. These bills were rendered for electric energy furnished during the time the injunction order was in effect. On receipt of these bills the defendant would make a monthly statement of them, and issue their voucher check reading as follows:

> " 'Light current ........................... $1,306.75
>     Railway current ......................... 437.38
>
>     Total ................................ $1,744.13'

"On the bottom of the voucher it says:

" 'Pay to the order of Bowersock Mills and Power Company, $1,744.13, amount payable in full settlement of statement accompanying this check.'

"The check read the same way: 'In full settlement of statement accompanying this check.' I presume that the statement has reference to the items at the head of the voucher, on the voucher check. On the back of the check is the indorsement:

" 'Indorsements. The indorsement of the payee hereon is an acknowledgment of the receipt of the statement referred to on the face of this check, and in full payment thereof.'

"These checks were made monthly by the defendant and given to the plaintiff company.

"The first question is, did that constitute an accord and satisfaction? I think we must first determine what the circumstances were at the time these checks were given. In 1918 the plaintiff complained, and had been for some time, that the contract was burdensome on it, and it had a right to terminate the contract under the terms thereof, and in fact did serve a notice of termination in 1918, but never carried it into effect. In June, 1919, a notice to terminate was served by the plaintiff upon the defendant and the injunction suit followed. No bond was given at the time that the temporary restraining order was procured from the probate court, no bond was ever given in the district court, and no bond was ever asked for. The validity of the proceedings was never challenged on account of the failure of the Railway and Light Company to give such a bond. The order of the probate court reads as follows:

" 'That said defendants (the plaintiff in this case) and each of them, be and they are hereby restrained, until the further order of the court, from discontinuing and cutting off the supply of electric energy necessary for the uses of said plaintiff.'

"The restraining order simply enjoined them from cutting off and discontinuing the supply of electric current to the plaintiffs in that case. Nothing was said as to the rate at which they should continue to furnish the electricity, other than that they were enjoined from cutting off the supply. Undoubtedly the Lawrence Railway and Light Company at the time thought that they were paying the full value of the service, all that they would be required to pay at the time of these various monthly payments. They were contending that they had a right to this service at the rate of one and one-fourth cents under the contract, and brought this injunction suit to determine whether or not the plaintiff had a right to abrogate the contract. The defendants undoubtedly thought that they had a right to that current at one and one-fourth cents—that was their position in court, and that was their position out of court. So far as the intentions of the defendant were concerned, its attitude in the matter, I am satisfied that they were of the belief they were paying the full amount which they were required to pay for the current during this interim. As to the attitude of the plaintiff, they either did or did not intend to charge an additional amount. If the plaintiff did not intend to charge anything in addition to the one and one-fourth cents and billed the defendant company at the rate of one and one-fourth cents per kilowatt each month for the current used during the preceding month, the question of accord and satisfaction does not enter into the case. It isn't a question of accord and satisfaction, but rather as to the effect of the extinguishment or payment of the debt. If the plaintiff only intended to charge one and one-fourth cents per kilowatt for the energy furnished and the defendant paid that amount, the debt was extinguished. If, on the other hand, they intended to charge an additional amount in excess of the one and one-fourth cents, then perhaps

the doctrine of accord and satisfaction would enter into the case. But I am inclined to think, as I have stated, that it was not the intention of the plaintiff to charge any more, and that the debt was extinguished by these monthly payments. If we assume that the plaintiff did in fact intend to charge more than the contract rate, then we would have to look into the facts and circumstances of the case to determine whether or not there has been an accord and satisfaction.

"The authorities seem to make a distinction between a liquidated debt and an unliquidated debt. I do not know as it is necessary to go into the law of the case, as the attorneys are familiar with the rule. I might, however, state my own views with reference to it. When the amount of the debt is not liquidated and is in dispute, then a payment of an amount conceded to be due is an accord and satisfaction. The rule is just the opposite if it is a liquidated statement. The rule is found in 1 C. J., at pp. 539-555 and 561, and as applied to checks at 562. In the case of *Neely v. Thompson*, 68 Kan. 193, 197, I think a good deal of light is thrown upon that proposition. I do not think it is necessary for the court to refer to it in detail, as the attorneys in this case are familiar with it. In that case Neely wrote and mailed a letter to Thompson, who was evidently an employee of Neely as United States marshal, with reference to an amount of money which was owing to Thompson. In the letter Neely said:

" 'I have credited you with all reallowances and send herewith a full statement of your account. Look it over, and if there is any item you do not understand, if you will come to Leavenworth we will go through the original statements and I will explain it to you. Please find inclosed my check for $7.90, payable to your order, by the Manufacturers' National Bank of Leavenworth, which is in full satisfaction of balance due you on account of fees and expenses as deputy U. S. marshal.'

"The court held that the letter written under the circumstances stated in the opinion, constituted an accord and satisfaction when the check for $7.90 was retained by Thompson. The court in its opinion quotes from 1 Cyc. 333, note 72, as follows:

" 'According to the weight of authority, where a claim is in dispute and the debtor sends or gives the creditor a check for a less sum, which he declares to be in full payment of all demands, the retention thereof by the creditor constitutes an accord and satisfaction.'

"In the present case we have the defendant each month sending a check with the statement on the back reciting that:

" 'The indorsement of the payee hereon is an acknowledgment of the receipt of the statement referred to on the face of this check and in full payment thereof.'

"The statement does not say at what rate the current was billed. The original statement from the Bowersock Company said one and one-fourth cent. The statement referred to upon this check does not give any rate, but refers to it as the service which was supplied, and then says that it is payment in full for that service. I am inclined to think that if the plaintiff intended to charge an amount in addition to the contract price, and the amount of the excess was not ascertained, it would be unliquidated, and it would be as

Jackman v. Kansas Electric Power Co.

the plaintiff now contends, the reasonable value of the energy furnished. So far as the plaintiff is concerned, it probably never thought of any excess or ever having a claim therefor. If the plaintiff received these monthly checks intending at the time to charge more, and under circumstances which would indicate that the defendant thought it was paying the full amount for the energy furnished, I am inclined to think that would be an accord and satisfaction.

"I do not care, however, to base my opinion upon that point solely. I think there is the additional ground of estoppel that is perhaps the better one on which to base the opinion. The defendant contends that the plaintiff is estopped to claim an additional sum in this case over the contract price. As I have stated, the parties had had some disagreement over this contract. In June, 1919, the four parties met, Mr. Jackman and Mr. Bowersock, the two members of the firm operating the Mills and Power Company, and Mr. Emanuel and Mr. Skinner, president and superintendent respectively of the defendant company. These four men had a conference in Lawrence as to what should be done. It was discussed pro and con as to whether the plaintiff had a right to terminate the contract, the plaintiffs contending that they had that right and the defendant contending that they did not have that right. The testimony shows that Mr. Emanuel suggested the plan of the plaintiff serving a notice that they intended to abrogate the contract, and that then the defendant would go into court and procure a temporary injunction, restraining the plaintiffs from discontinuing the service, and in that way they could determine whether or not the contract could be abrogated by the plaintiffs, as they contended. The parties were very friendly at the time. The matter apparently was freely discussed. The railway company wanted considerable time, and wanted the notice to be of such duration that they would have plenty of time to prepare their case for filing. On the other hand, Mr. Bowersock contended that the matter had continued too long and he wanted early action. The result of the conversation was that Mr. Emanuel's request for a longer period within which to get ready for the suit was not complied with, and Mr. Bowersock served his notice, effective July 1. The procuring of this temporary injunction was discussed as a means of getting the matter before the court for determining the right of the plaintiff to terminate the contract.

"The court has had the testimony of those men transcribed. The evidence is not sufficient for the court to base a finding that there was an agreement that the old rate would continue. The transcript shows that Mr. Emanuel testified that it was to be a friendly suit, and that he suggested the giving of the notice, and that Bowersock and Jackman agreed to serve the notice. The testimony of Mr. Skinner goes further and shows that in response to a question which was asked:

" 'Q. I want to know, Mr. Skinner, what, if anything, was said at that conversation, either by Mr. Jackman or Mr. Bowersock, in regard to the furnishing of the current or service during the pendency of the case? A. Go ahead and continue the service.

" 'The Court: Who would? A. Between Mr. Bowersock and Mr. Emanuel; the agreement was that they would go ahead and furnish the current just as they had in the past.'

"Mr. Jackman testified, 'I am satisfied there was never any such conversation

as testified to by Mr. Skinner.' So, you have the testimony of Mr. Emanuel seemingly to the effect that this matter was discussed, and that it was to be a friendly suit. Mr. Skinner testified that the Mills Company was to go ahead and furnish the current just as they had before, and Mr. Jackman testified for the plaintiff that there was no such conversation had. Under this testimony the court would not be warranted in finding that the parties expressly agreed that they would continue to furnish the current under the contract rate. I think the situation was just this: The plaintiffs contended that they had a right to abrogate the contract, the defendants contended that they did not have that right, and that both sides wanted the question determined. In fact, they had discussed having it determined, as I recall the evidence, by the judge of the district court, as an arbitrator, but it was said that would not be final, so they discussed bringing this suit. The suit was brought, the intent being by both parties to have a determination of the matter of the plaintiffs' right to abrogate. I think both sides anticipated that the matter would soon be disposed of, and they hurried the matter along so the issues could be made up for the November term of court.

"Probably at the outset, as in many other cases, the parties never contemplated the filing of an appeal. I doubt if they contemplated an appeal to the supreme court at that time. They probably thought that within a few months they could get the matter determined by the district court of Douglas county. However, instead of an early determination and adjudication by the district court, a determination was not had until, I think, in January, 1920. The defendant then took an appeal and that delayed the final adjudication until November, 1921. I think the mandate was received in Douglas county from the supreme court some time in the early part of January, 1922. I do not think in 1919 that it was ever within the contemplation of either party that there would not be a final judicial determination as to whether or not the plaintiff had a right to teminate the contract, until 1922. The parties never contemplated such a delay. I think at that time neither side thought very much about the price; they wanted, and I think, anticipated an early decision. I do not think the parties agreed that it would be at the old contract price, that no express agreement was made, but simply that they anticipated an early decision would be had, and that was all they wanted.

"The defendant believed, or had reason to believe, that the plaintiffs intended, by what they did, to charge the value of this current every month. When the plaintiff accepted these checks in full payment therefor, and refrained from saying anything at that time as to their intention of charging an amount in excess of the contract price, I think they would be estopped from claiming the excess at this time. If the plaintiffs intended at that time to charge an extra amount, I think they should have notified the defendant of their intention to do so. It may very well be that the defendant could have gotten current elsewhere—they might have made some other arrangement. It might be that the defendant light company would have made some provision to recoup itself against this extra charge by an increase of rates to the general public for the electric current furnished by it. There was no suggestion whatever that any additional or excess amount would ever be charged, or that the plaintiff intended to make that claim. One would think that if the plaintiff had in mind the intention of claiming an amount in excess of what they had already asked

for and received, they would have required the giving of an injunction bond, in order to protect themselves from any damages they might have suffered, if any. I think the very fact that there was no complaint made of the fact that the defendant had not given a bond, nor that the validity of the temporary injunction order was never questioned—and of course the temporary injunction order up until the time it went into final judgment was not valid without a bond—that question was never raised. I think both parties acquiesced in the suggestion that they wanted an early trial, and at the outset, at any rate, I doubt if the plaintiff ever intended to claim an additional amount. If they did have that in their mind, I think it was their duty to indicate it to the defendant. The plaintiffs having failed to do anything to indicate that they intended to charge more, and the defendants believing all of the time that these monthly payments satisfied in full the amount to be charged for the current, I think the plaintiff would be estopped at this time to claim an additional amount over and above the contract price.

"If I am right on either of the two propositions, either accord and satisfaction or the doctrine of estoppel, it renders a consideration of the other defenses unnecessary. In other words, it would not be necessary for the court to determine the effect of the defense of the statute of limitations, and neither would it be necessary for the court to determine how much power was generated by steam and how much was generated by water power, to which the defendants were entitled under the 1909 contract.

"I think I can say, in effect, that the court would find the value of the steam power that the plaintiffs furnish the defendant worth approximately two cents per kilowatt. The amount of steam power that was furnished, as distinguished from the water power, if I am right in either of those two propositions, it would be unnecessary for the court to determine.

"The defendant claims that the restraining order was invalid because there was no bond given. That defense would not be tenable for a moment, because the defendant itself procured the temporary injunction, and it could not turn around and say what they did was not lawful because it did not do all that it should have done. There is nothing to that defense.

"I think the first question the plaintiff is met with is the defense of accord and satisfaction, and, second, the doctrine of estoppel. I think that disposes of the first question."

The second count in the petition is based on a claim for equipment taken over by defendant in pursuance of the contract of 1909. Plaintiff had contracted to supply an auxiliary steam or gas plant and furnish electric-storage batteries to supplement the water-power plant, and plaintiff was given the right to take over a small electric plant owned by the defendant at a price of $8,000, which was done. This plant it appears was built into the larger auxiliary plant provided by plaintiff, which, with the storage batteries furnished, was of the value of $99,843 on July 1, 1919, when the contract was abrogated. That contract had provided that if the water power was not satisfactory for carrying out the purposes of both parties, the de-

fendant should have the right to purchase the auxiliary plant at its then value, to be fixed by agreement or by arbitration, but that pending a determination of the value the defendant had a right to take immediate possession of it. Possession of the plant was taken by the defendant on January 22, 1922, and its value at that time, including the storage batteries, was $88,897. Payment has not been made for this equipment. The storage batteries it appears were installed to equalize surges in the current caused by the street-railway system and were operated for the mutual benefit of both parties. A question was raised as to whether the batteries should be regarded as included in the plant. They were taken over by defendant with the other property and were treated as a part of the plant. In fixing the value of the auxiliary plant taken over, the court included the storage batteries. They were used to start the motor generators, were necessary to the operation of the defendant street railway, and aided in the operation of the plant during the peak hours of the electric-lighting load. We think they may fairly be considered a part of the plant within the meaning of the option contract.

The principal dispute that has arisen between the parties under the second count is as to the value of the plant. The amount of recovery is to be fixed by the value of the property at a certain time. What is that time? The plaintiff contends that it is the time the contract was abrogated, in July, 1919, while the defendant urges that it was the time the defendant took possession of the property, which was January, 1922, and the contention of defendant was sustained by the trial court. There was a substantial difference in the values of the plant at the different times mentioned, and to enable the parties to present and have determined the bare legal question, the court made findings of value as of each date. What time did the parties intend when they contracted for the payment of value? Their intention must of course be obtained from the language employed in the contract. As we have seen, the parties contracted that in the event the water power did not satisfactorily accomplish their purposes, the contract might be annulled and the right to purchase the auxiliary plant at its then value acquired. What is its "then" value? Webster defines the word "then" as "at that time, referring to a time specified." The time fixed by the contract is the event previously specified therein, and to which the term "then" must have referred. When the contract was terminated the rights of the parties became

Jackman v. Kansas Electric Power Co.

fixed, both as to the right to purchase and the date on which value was to be measured in case of purchase. As values fluctuate with the lapse of time, it was important to the parties that a time for fixing values should be named. In stipulating that a certain event shall mark the termination of the contract, and the right of purchase, we conclude that it necessarily also fixes July 1, 1919, as the time for measuring the value of the plant taken over.

The judgment of the court as to the first cause of action is affirmed, and on the second cause of action the judgment is modified to the extent that plaintiff shall be awarded judgment for the amount found to be the value of the property on July 1, 1919.

Harvey, J. (concurring specially): I think the conclusion reached is correct on both counts, and I am not seriously opposed to the process of reasoning in the first count, but am inclined to think that accord and satisfaction is relied upon more strongly than is necessary. My own conclusion as to the first count was influenced largely by the following: There had been two contracts between the parties —one of 1906, the other 1909. Each provided the rate of one and one-fourth cents per kilowatt hour. The contract of 1909 provides, among other things:

"If, after the installations are made as herein provided for by the party of the first part, it should be ascertained after careful trial and demonstration, that the water power is unsatisfactory and insufficient to operate the mills of the party of the first part and the plants of the party of the second part, then this contract shall be abrogated and declared null and void, and in such event the contract made January 2, 1906, . . . shall be in full force and effect," etc.

Now, when the parties were having their controversy in 1919 with regard to a termination of the contract, the question was not one of the rate to be charged or paid, but it was one of insufficiency of current. The mills had been repeatedly shut down within the year then last past in order to give current to the electric company. "Mr. Bowersock said a good crop of wheat was coming and they were going to run the mills whether there was any light or not." In the injunction suit brought there was no intimation in the pleadings or the evidence that the rate was inadequate. The controversy between the parties did not pertain to the rate. No higher rate was asked. Plaintiff made no suggestion that it might furnish the current if an additional rate were paid, and there was no dickering or controversy, or even talk, about the question of rate. Plaintiff was unable, with

the facilities it then had, to furnish enough electric energy for its own purpose and for defendant, and wanted to quit furnishing electric current for defendant in order that it might use the current for its own business. That was the whole controversy. The trial court found:

"There is no evidence whatever that the plaintiff intended at the time of the rendition of its several monthly statements from July, 1919, until January, 1922, to charge an additional amount in excess of the contract price for the energy furnished, or one and one-fourth cents per kilowatt."

Now, it may well be said that even if the contract of 1909 were abrogated plaintiff was still bound to furnish current generated by water power under its contract of 1906 at one and one-fourth cents. But whatever the reason was, there was no controversy between these parties over the rate to be paid for power furnished. With no controversy pending as to the rate, plaintiff made bills from month to month computed upon the electric energy consumed at one and one-fourth cents, and was paid in full each month for the current furnished. I think the effort to get more for this current was an afterthought; it is a contention that was not made by plaintiff until after the final determination of the injunction suit in this court. If this analysis of the situation is correct it doesn't make much difference what reason was given by the trial court for its ruling—the plaintiff is not entitled to recover.

The real reason, in my judgment, is that, first, the contract of the parties provided the rate of one and one-fourth cents even in the event of the 1909 contract being abrogated; second, that the parties so understood that and acted upon it. If there can now be said to have been any controversy between the parties on this question it was settled and determined by the manner in which the bills were rendered and the payments made, and therefore disposed of under the doctrine of accord and satisfaction; and in view of all the facts and circumstances the plaintiff is estopped from contending that he should have more money. Neither do I regard this conclusion as being any specific hardship on plaintiff. While it is true a part of the electric energy was generated by steam at a slightly increased cost of production, yet by far the greater part of it was generated by water power, with no evidence to indicate an increased cost of such production. I do not think it can be said, under the record in this case, that the current furnished cost more to produce than plaintiff has already received.